**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK**

KEITH D. MURPHY,

                Plaintiff,

-vs-

MICHAEL J. ASTRUE, Commissioner of Social Security,

                Defendant.

DECISION and ORDER
08-CV-6343-CJS

**APPEARANCES**

For Plaintiff:                Christopher M. Mesh, Esq.
Connors & Ferris, LLP
3445 Winton Place Suite 112
Rochester, NY 14623
(585) 262-2667

For Defendant:            John J. Field, A.U.S.A.
United States Attorney's Office
100 State Street Room 620
Rochester, NY 14614
(585) 263-6760

**INTRODUCTION**

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner"), which denied the application of plaintiff Keith D. Murphy ("Plaintiff") for disability insurance benefits. Now before the Court is Plaintiff's motion (Docket No. 7) for judgment on the pleadings seeking an order directing that the matter be remanded solely for the calculation of benefits, and the Commissioner's cross-motion (Docket No. 10) for an order affirming the his decision.

For the reasons that follow, Plaintiff's application is granted in part, denied in part, the Commissioner's application is denied, and this matter is remanded for a new hearing.

## BACKGROUND

### *Procedural History*

On June 29, 2005, Plaintiff applied for disability benefits, claiming an onset date of July 16, 2004. (Record at 11.) The Commissioner initially denied the application on October 13, 2005, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Record at 20-24.) The hearing was held on February 19, 2008, via video conference. (Record at 240-71.) On April 24, 2008, the ALJ issued a decision finding that Plaintiff was not disabled. (Record at 8-18.) The ALJ's decision became the final decision of the Commissioner on June 30, 2008 when the Appeals Council denied Plaintiff's appeal.

### *Plaintiff's Vocational and Educational Background*

Plaintiff was born on July 29, 1954, and was 53 years old on the day of the ALJ's decision. He completed the 11th grade in school. (Record at 244.) His past relevant work includes over 20 years of doing assembly work. (Record at 54.) In his decision, the ALJ determined that Plaintiff could no longer perform past relevant work. (Record at 17.)

At the hearing, Plaintiff testified that he was "not really" experiencing problems with weakness anywhere in his body. (Record at 253.) He stated he could probably lift twenty pounds up to shoulder height with both hands, but above shoulder height only with his left hand. (Record at 258.) He said he could walk, but experienced some initial knee stiffness. (Record at 259.) Plaintiff testified that he had no problems standing, sitting, pushing, pulling, stooping, or climbing stairs, but that squatting caused his knees to pop. (Record

at 259-60.) He also testified that his blood pressure was controlled by medication. However, he indicated that when he used the medication to lower his blood pressure, he often got dizzy when he stood. He explained that the doctors were working with him to adjust the dosage to prevent dizziness. (Record at 250.)

Regarding his activities of daily living, Plaintiff testified that he washed the dishes, vacuumed, sometime made the beds, and cooked meals, but that he did not do yard work or take out the trash. (Record at 256-57.) As part of his disability application, Plaintiff submitted an activities of daily living questionnaire. (Record at 64-71.) On the questionnaire, Plaintiff stated that he: took care of his own personal hygiene and grooming needs; watched television; walked for 1/4 mile before needing rest; drove his car; grocery shopped; and socialized. (Record at 64-71.) He also wrote that he had difficulty paying attention, finishing what he started, remembering things, and dealing with stress. (Record at 70-71.) He further nidicated that he could follow instructions, had no difficulty getting along with bosses or others in authority, and had not lost a job due to difficulty getting along with people. (*Id.*)

### *Medical Evidence*

On January 10, 1997, well prior to the July 16, 2004, onset date of Plaintiff's disability, Plaintiff was treated by Alex Strasser, M.D., for an injury to his right hand (Record at 106-07).

On January 20, 2004, Plaintiff complained of right shoulder pain following a work-related accident on the previous day. He was seen by Stephanie Siegrist, M.D., an independent medical examiner. (Record at 159.) After examination, Dr. Siegrist concluded that Plaintiff's prognosis was "good with non-operative treatment" consisting of physical

-3-

therapy and home exercises. (Record at 159-60.) She released him to return to full activity without formal restrictions. (Record at 160.)

On February 25, 2004, an MRI of Plaintiff's right shoulder showed a greater tuberosity fracture. (Record at 214.)

On March 11, 2004, Dr. Siegrist diagnosed right shoulder pain, impingement, and contusion. (Record at 156.) She wrote in her report the following under "Work Status: Totally disabled. Out of work/play due to these symptons. Prognosis is excellent. Expect to RTW after f/u visit." (Record at 156.) On May 4, 2004, Dr. Siegrist observed that Plaintiff's right shoulder exhibited a full range of motion with good strength and wrote that he could return to work, with no restrictions on May 18, 2004. (Record at 154.)

On March 23, 2004, Plaintiff was admitted through the Unity Health System's Department of Psychiatry at Park Ridge Hospital, where an Emergency Center Psychiatric Assessment was made. (Record at 122-25.) In the discharge summary, dated July 30, 2004, is the following information:

> Pt. Is a 49 yr old w/s/m, who is transferred here after a severe OD Zoloft and was admitted to psy in-pt. He was there 3/23.04 until [obscured].[1] Dx of Major Depressive, Adjustment D/O w/ depressed mood, [obscured]iety and alcohol abuse. [Cur]rentlly is scheduled to begin CD tx yesterday [sic].
>
> [obscured]o being treated medically for a fx Rt shoulder. (Fell in pk lot at [wor]k in Jan). [Cur]rently is out of work on Workman's comp.

(Record at 126.) Plaintiff related to Park Ridge staff that he had attempted suicide in September 2003, December 24, 2003, and March 22, 2004, and that he had "most recently [taken] a bottle of Zoloft and [dra]nk 1/3 bottle of vodka." (Record at 127.) Plaintiff

---

[1] A hole punched into the paper at this point obscures the date and the only part showing reads, "9/04."

-4-

told Dr. Leon Canapary, an attending psychiatrist, that he drank every night and was drunk at least five nights per week. (Record at 113.) During the course of hospitalization, plaintiff's mood brightened and his suicidal ideation subsided. (Record at 114). Dr. Canapary noted that,

> [w]e tried to impress him that he was depressed because of the drinking and that there was an increased rate of suicide in people who are unable to control their alcoholism who felt that they could when they were sober. During the course of this hospitalization, there were no symptoms of withdrawal and he began to feel better as time went by. His intermittent suicidal ideation left him on the 4th hospital day and he was discharged on the 5th hospital day. He would not accept that he needed in patient CD treatment but he did agree to ambulatory CD treatment. He was referred to Park Ridge Hospital for a CD evaluation and returned to his physician for medical concerns. He was discharged with no psychotropic medications.

(Record at 114.) Dr. Canapary also wrote that on admission, Plaintiff's GAF score[2] was 29, and on discharge was 49.

From March 25, 2003, until March 11, 2004, Dr. Siegrist saw Plaintiff for the purposes of Workers' Compensation with regard to his complaint of bilateral knee pain. (Record at 108-09.) Dr. Siegrist assessed bilateral iliotibial band syndrome with possible bursitis in the right knee, and a minimally symptomatic left knee. (Record at 108.) Dr. Siegrist prescribed stretching exercises to relief the poor flexibility with respect to the knee pain. (Record at 109.)

---

[2]The Commissioner's memorandum of law, at 4, n.2, provided this explanation: "[a] GAF score of 21 to 30 signifies a serious impairment in communication or judgment (*i.e.* [sic], sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) and an inability to function in almost areas (*i.e.* [sic], stays in bed all day, no job, home, or friends). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., rev. 2000). A GAF in the range of 41 to 50 signifies serious symptoms (*e.g.*, suicidal ideation) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *Id.*

On March 31, 2004, Audrey Schaeffer, RN, a therapist at the Unity Health System, preformed an intake assessment of Plaintiff. Ms. Schaeffer diagnosed major depression, one episode, unspecified, and alcohol dependence, as well as a current GAF score of 65 with a GAF score of 80[3] within the past year.

On August 23, 2004, police took Plaintiff to the emergency room of Strong Memorial Hospital, because he had written a suicide note. (Record at 135-40.) Mary Meyers, M.D., diagnosed Plaintiff as suffering from depression not otherwise specified, alcohol abuse, and a GAF score of 60. He was discharged the same day. (Record at 138.)

On March 10, 2005, Plaintiff saw Dr. Siegrist and told her that his right shoulder pain was improved. (Record at 153.) Dr. Siegrist observed that Plaintiff's right shoulder had a full range of motion and good strength, and that x-rays were unremarkable. She noted that Plaintiff's symptoms had been unchanged for the last several months and determined he had a healed greater tuberosity fracture, but for workers' compensation purposes, determined that he had a 15% loss of use of his right shoulder. (Record at 153.)

On September 12, 2005, Plaintiff was examined by Robert Hill, Ph.D., a licensed psychologist and consultative examiner. (Record at 177-81.) Dr. Hill's diagnosis was:

Axis I     Depressive disorder, NOS.
           Anxiety disorder, NOS.
           Rule out alcohol dependence.

---

[3]The Commissioner stated in his memorandum of law, at 5, n.3: "A GAF in the range of 61 to 70 signifies some mild symptoms (*i.e.*, depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, with some meaningful interpersonal relationships. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., rev. 2000). A GAF in the range of 71 to 80 signifies that if symptoms are present, they are transient and expectable reactions to psychosocial stressors (*i.e.* [sic], difficulty concentrating after a family argument) or no more than a slight impairment in social occupational, or school functioning (*i.e.* [sic], temporarily falling behind in school work). *Id.*

Axis II   No diagnosis.

Axis III  History of shoulder injury.
          Problem with knees.
          Rule out hearing loss.
          High blood pressure.

(Record at 180.) He recommended referral for medical follow up evaluation, referral for further psychiatric intervention (particularly to rule out substance abuse) and referral to assist plaintiff in dealing with grief over the loss of his wife. He wrote that Plaintiff "may benefit from some vocational training pending ability to return to prior occupation," and gave his prognosis as "fair to good with some support in treatment." (Record at 181.)

On September 12, 2005, plaintiff was examined by Harbinder Toor, M.D., a consultative physician. (Record at 182-85.) Dr. Toor determined that Plaintiff's prognosis was good, and the he had a "mild limitation for pushing, pulling, and lifting with the right shoulder. Mild limitation for standing for a long time, squatting, and walking for long distances." (Record at 185.)

On October 12, 2005, a non-examining state agency psychological consultant, M. Totin, PsyD, reviewed Plaintiff's medical records and determined that Plaintiff's depressive, anxiety, and substance abuse disorders were non-severe impairments. (Record at 188, 191, 193, 196; 20 C.F.R. §404.1521(a).) Dr. Totin also assessed that Plaintiff had mild limitations in performing the activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, and that he had had one or two episodes of decompensation. (Record at 198).

On October 13, 2005, a medical consultant[4] completed a residual functional capacity assessment. He concluded that Plaintiff could occasionally lift, or carry, or both, up to 50 pounds, and frequently lift 25 pounds, could stand or walk about six hours in an eight-hour workday, could sit about six hours in an eight-hour workday and that plaintiff had no restrictions on pushing or pulling. (Record at 203.)

As indicated above, on February 19, 2008, Plaintiff appeared before the ALJ for an administrative hearing. Following that hearing, Plaintiff was examined by two consultative doctors.

On March 21, 2008, Christine Ransom, Ph.D., performed a consultative examination of Plaintiff. Her diagnosis was:

Axis I   Alcohol dependence, in remission.
         Major depressive disorder, with agitation, currently moderate.
         Anxiety disorder, NOS, currently moderate.
         Rule out alcohol dependence.

Axis II  None.

Axis III Hepatitis, high blood pressure and high cholesterol.

(Record at 219.) She recommended he seek treatment for depression and anxiety and determined that his prognosis was fair to good with appropriate mental health treatment. (*Id.*)

On March 21, 2008, Dr. Toor examined Plaintiff, consultatively, and determined that his prognosis was fair, that he had mild to moderate limitations for pushing, pulling, lifting and reaching due to pain in his right shoulder. (Record at 225.) He further determined that

---

[4]The medical consultant's signature is illegible, however, in the signature block is typed: "Kopera ." (Record at 207.)

Plaintiff had mild limitation standing, walking, squatting, or walking up or down stairs due to pain in his knees. (Record at 226.)

## *The ALJ's Decision*

The ALJ determined that Plaintiff met the insured status required by the Social Security Act through December 31, 2009. He further determined that Plaintiff had not engaged in substantial gainful activity since July 16, 2004, and that Plaintiff suffered from a combination of the following severe impairments: depression, anxiety, alcohol dependence and right shoulder tendinitis. (Record at 14.) The ALJ also found that Plaintiff did not have an impairment or combination of impairments[5] that met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. (Record at 15.)

The ALJ decided that there had not been a significant erosion of Plaintiff's occupational base due to the non-exertional limitations and that he could perform the full range of medium work. Thus, the ALJ concluded Plaintiff was not disabled. (Record at 18.)

---

[5]The ALJ found that Plaintiff could "lift/carry 50 pounds occasionally and 25 pounds frequently, sit 2 hours in an 8 hour day and stand/walk 6 hours in an 8 hour day." The ALJ also determined that Plaintiff, "cannot work in an area with unprotected heights or around heavy, moving or dangerous machinery. He cannot climb scaffolds or ladders. He has occasional limitations in his ability to reach in all directions with his right hand. He has occasional limitations in his ability to push or pull with his right upper extremity. He has occasional limitations in his ability to understand, remember and carry out detailed instructions. He has occasional limitations in his ability to interact appropriately with the general public, except instruction and respond appropriately to criticism from supervisors, or get along with coworkers or peers. He can work in a jab [sic] with up to a moderate amount of stress." (Record at 16.)

## STANDARDS OF LAW

### *Appellate Review Standard*

Title 42 U.S.C. § 405(g) (2008) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

## DISCUSSION

### *Jurisdiction and Standard of Review*

Title 42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

Schaal, 134 F.3d at 501 (Citations omitted). At step five of the five-step analysis above, the Commissioner may carry his burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. Pratts v. Chater, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); see also, SSR 83-10 (Stating that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the Commissioner cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[6] Pratts v. Chater, 94 F.3d at 39; see also, 20 C.F.R. § 416.969a(d).[7]

---

[6]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[7]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2). However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).

## *Analysis*

Plaintiff argues that:

> the ALJ based his Decision that the Plaintiff was not disabled upon the report of a non-doctor, disability analyst (Tr. 202-207). The ALJ's reiteration in Finding No. 5 of the non-examining analyst's opinion completely ignores the opinions of the Plaintiff's treating physicians that would restrict the Plaintiff's Residual Functional Capacity (RFC) to, at most, sedentary work. Further establishing the lack of substantial evidence is the fact that the ALJ Ordered that the Plaintiff undergo a Consultative Examination subsequent to the hearing. Despite the ordered physical exam (Tr. 223-234), and the severity of the restrictions identified therein, the ALJ still chose to ignore his own examination and adopt the findings of the non-examining analyst.

(Pl.'s Mem. of Law at 9.) The Record indicates that Joseph Dipoala, M.D., is Plaintiff's treating physician. (Record at 162-74.) Plaintiff does not, in his memorandum of law, identify any other treating physician. However, the record does not contain an opinion or finding by Dr. Dipoala which is contrary to the ALJ's determination of Plaintiff's residual

---

based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

functional capacity. Even if the Court were to consider the opinion of Dr. Siegrist, who examined Plaintiff's injured right shoulder in connection with a workers' compensation claim, she concluded that Plaintiff had a healed greater tuberosity fracture, and that, for the purposes of workers' compensation, that he had a 15% loss of use of his right shoulder. She did not, though, give any opinion as to Plaintiff's ability to push, pull, lift, walk, sit, stand, or climb. Further, the opinion of Dr. Toor, a consultative examining physician, was that Plaintiff had a "mild limitation[8] for pushing, pulling, and lifting with the right shoulder. Mild limitation for standing for a long time, squatting, and walking for long distances." (Record at 185.)

Moreover, although Plaintiff's memorandum of law cites case law and the Commissioner's regulations pertaining to the treating physician rule, it does not specify the factual basis for the argument that the ALJ ignored a treating physician's opinions. Not even Plaintiff's own testimony contradicts the ALJ's determination. Therefore, the Court determines, that the ALJ did not violate the treating physician rule.

Plaintiff also contends that the ALJ improperly assessed his credibility. Plaintiff claimed in his Disability Report, dated August 19, 2005 (Record at 53), that he was disabled due to: [b]ilateral knee[] problems, right shoulder injury, depression, hypertension, right ear problems," and that these conditions limited his ability to work because, "I can't do anything. If I bend over my knees pop and hurt. I can't lift much. I

---

[8]"In his report, Dr. Oge stated that Plaintiff suffered from dyspnea, chest pain, neck pain, and lower back pain but that Plaintiff only suffered from a mild limitation in carrying, lifting, stooping, kneeling, and squatting. See id. Accordingly, based upon this Court's review of the record, Plaintiff has not established that any of his treating physicians have placed any physical limitations on him during the relevant time period." *Foster v. Astrue*, No. 4:07-cv-04069, 2008 WL 4007170, *10 (W.D.Ark. Aug. 26, 2008).

have pain in my shoulder and knees. I was feeling suicidal and very depressed." (Record at 53-54). Yet, during the ALJ's hearing, Plaintiff testified that he could lift twenty pounds up to shoulder height (Record at 258), that he had no difficulty walking, other than some initial knee stiffness (Record at 259), that he had no problems standing, sitting, pushing, pulling, stooping, or climbing stairs (Record at 259-60). In addition, during a visit with treating physician Dr. Dipoala on May 24, 2005, he said, "[h]e stopped XOLOFT over six months ago and is not depressed because he has a relationship with a woman." (Record at 163.) He testified to the ALJ that his hypertension was controlled by medication and that he was not using a hearing aid for his right ear hearing loss. (Record at 250.) Plaintiff contends that, "[i]t is improper for the ALJ to state that the Plaintiff's allegations are not entirely credible when the Plaintiff's treating physicians and the consultative examiners' opinions all support the Plaintiff's credibility. The Plaintiff's work history and numerous hospitalizations also further support his credibility." (Pl.'s Mem. of Law at 15-16.) The Court disagrees and finds that the Record, as it stands, supports the ALJ's credibility determination. The Commissioner's regulation states that in determining how symptoms, such as pain, affect a claimant's ability to work,

> [w]e will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, the signs and laboratory findings, and statements by your treating or nontreating source or other persons about how your symptoms affect you.

20 C.F.R. § 404.1529(c)(4) (71 F.R. 16445, Mar. 31, 2006).

Finally, Plaintiff argues, that the ALJ failed to fully develop the record of his disability. (Pl.'s Mem. of Law at 13.) He contends that, "[t]he ALJ failed to recontact the Plaintiff's treating physicians and failed to fully understand the restrictions identified in the

-14-

consultative examination scheduled subsequent to the hearing." (*Id.* at 14.) The Court notes that, "[b]ecause a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record. This duty exists even when the claimant is represented by counsel...." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). "The regulations also state that, '[w]hen the evidence we receive from your treating physician...or other medical source is inadequate for us to determine whether you are disabled,...[w]e will first recontact your treating physician... or other medical source to determine whether the additional information we need is readily available.' 20 C.F.R. § 404.1512(e)." *Id.*

Since Plaintiff does not identify the treating physician or physicians to whom he refers, the Court can only presume he means Dr. Dipoala and, possibly, Dr. Siegrist. The only opinion from either on Plaintiff's inability to work was Dr. Siegrist's conclusion that Plaintiff was temporarily totally disabled. Plaintiff does not identify any deficiencies in the records the ALJ obtained from either doctor. In a letter to the Appeals Counsel, Plaintiff's attorney referred to consultative examiner, Dr. Toor, who determined that Plaintiff had mild limitations for lifting with his right shoulder. (Record at 185.) Plaintiff, though, does not contend that the Record is missing reports from treating physicians.

However, the Court notes that Plaintiff's argument that the ALJ should have sought clarification is persuasive. Dr. Toor, in September 2005, determined that Plaintiff had mild limitations in lifting. Then, in his post-hearing examination on March 21, 2008, Dr. Toor concluded that Plaintiff had mild *to moderate* limitations for pushing, pulling, lifting and reaching due to pain in his right shoulder. (Record at 225.) There is no explanation for the change from the September 2005 use of the term "mild" to the March 2008 use of "mild

-15-

to moderate." Since Plaintiff contends that he cannot perform medium work, but is, at best, only able to perform sedentary work, the ALJ should have re-contacted Dr. Toor to determine why his assessment changed from 2005 to 2008.

Based on its review of the Record, the Court determines that the ALJ did not carry out his duty to further develop the medical record. Accordingly, the case must be remanded to permit the ALJ to obtain and assess further information from Dr. Toor with regard to Plaintiff's physical residual functional capacity. The Record does not support a grant of benefits as it now stands, thus the Court will deny Plaintiff's motion to remand the case solely for the determination of benefits.

## CONCLUSION

Plaintiff's motion (Docket No. 7) for judgment on the pleadings is granted in part, and the Commissioner's motion (Docket No. 10) for judgment on the pleadings is denied. The Commissioner's decision is reversed, and the case is remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

IT IS SO ORDERED.

Dated: April 15, 2009
Rochester, New York

ENTER:

*Charles J. Siragusa*
CHARLES J. SIRAGUSA
United States District Judge